**Philip SESAY, Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

**No. 01–4007.**

United States Court of Appeals,
Second Circuit.

Aug. 20, 2003.

Alan M. Strauss, Immigrant & Refugee Rights Clinic, Main Street Legal Services, Inc., City University of New York School of Law (Pamela Goldberg, on the brief), Flushing, NY, for Petitioner.

Megan L. Brackney, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Kathy S. Marks, Jeffrey S. Oestericher, Assistant United States Attorneys, of counsel), New York, NY, for Respondent.

Present: SACK, SOTOMAYOR, Circuit Judges, and BRIEANT, District Judge.*

### SUMMARY ORDER

Petitioner Philip Sesay is a native and citizen of Sierra Leone. He petitions this Court for review of the decision of the Board of Immigration Appeals ("BIA") finding him ineligible for asylum based on a presidential proclamation barring him from entry into the United States.

Sesay had a long career as a civil servant for the government of Sierra Leone, beginning in 1980. By October 1996, Sesay was the Acting Director of Protocol for the Ministry of Foreign Affairs, in the government of President Ahmed Tejan Kabbah, who had been democratically elected seven months earlier. In May 1997, President Kabbah was removed from power in a forcible coup by a paramilitary group known as the Armed Forces Revolutionary Council ("AFRC"). The AFRC made announcements on the radio directing all civil servants to remain in their

positions at work. Sesay complied, but within days of the coup submitted a request for three weeks of leave to visit his family in the United States. His request was denied. Shortly thereafter, Sesay was informed that he had been appointed State Chief of Protocol. Sesay accepted the appointment out of fear that he would be killed for refusing.

Sesay continued his attempts to get permission to leave the country, and he was ultimately able to depart Sierra Leone in December 1997. On December 20, 1997, Sesay attempted to enter the United States at JFK International Airport. On finding that his diplomatic passport had been revoked, Sesay told the Immigration and Naturalization Service ("INS") inspector that he was seeking asylum. He was found to have a "credible fear" of persecution, and was detained for further consideration of his application. On January 14, 1998, the INS served Sesay with a Notice to Appear, charging him as inadmissible for failing to have a valid entry document.

On the same day, President Clinton issued Proclamation 7062, which stated in relevant part:

In light of the refusal of the military junta in de facto control in Sierra Leone to permit the return to power of the democratically elected government of that country, . . . I have determined that it is in the foreign policy interests of the United States to suspend the entry into the United States of aliens described in section 1 of this proclamation.

63 Fed.Reg. 2871, 2871 (Jan. 14, 1998).[1] Section 1 of the Proclamation stated: "The

---

* The Honorable Charles L. Brieant, of the United States District Court for the Southern District of New York, sitting by designation.

1.  The President's authority to issue this Proclamation is granted in § 212(f) of the Immigration and Nationality Act ("INA") (codified

at 8 U.S.C. § 1182(f)) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary,

entry into the United States as immigrants and nonimmigrants of members of the military junta in Sierra Leone and members of their families, is hereby suspended." *Id.* The Proclamation further provided that persons considered to be members of the military junta in Sierra Leone would be identified by the Secretary of State. *Id.* The Proclamation was effective immediately and remains in effect as of the current date. *Id.*

Sesay's immigration proceedings commenced two weeks later, and Sesay applied for asylum under Immigration and Nationality Act ("INA") § 208 (codified at 8 U.S.C. § 1158) and withholding of removal under INA § 241(b)(3)(A) (codified at 8 U.S.C. § 1231(b)(3)(A)). In April 1998, while the immigration proceedings were pending, the State Department's Office of Asylum Affairs issued an advisory opinion concerning Sesay's request for asylum, noting that it considered him to be a member of the military junta and thus subject to the Presidential Proclamation. In September 1998, the Immigration Judge ("IJ") denied Sesay's requests for asylum and withholding of removal, and ordered him removed. The IJ held that Sesay was not eligible for asylum as a matter of law, because the Presidential Proclamation barred Sesay from entry into the United States. The IJ also held that although Sesay was eligible for withholding of removal, he had not met the requisite evidentiary burden to be granted that form of relief.

Sesay appealed the IJ's decision to the BIA, arguing both that he was eligible for asylum and that he was entitled to withholding of removal. In December 2000, the BIA affirmed the IJ's holding that Sesay was ineligible for asylum as a matter of law, but remanded Sesay's application for withholding of removal in light of changed country conditions. On remand, the IJ granted Sesay's application for withholding of removal, finding that because of violent and unstable conditions in Sierra Leone, and given Sesay's unpopularity with both sides in the political and military dispute, it was more likely than not that he would be subject to persecution should he be returned. The INS appealed this determination to the BIA, which dismissed the appeal.[2]

In his petition to this Court, Sesay argues that the BIA erred in holding that he was ineligible for asylum as a matter of law, because the Attorney General could have circumvented the bar to entry posed by the Presidential Proclamation by granting Sesay asylum and then immediately paroling him into the country. *See* Petitioner's Brief at 12, 17–18. We review *de novo* the BIA's legal conclusions. *Mardones v. McElroy*, 197 F.3d 619, 624 (2d Cir.1999). To the extent that the BIA's analysis turned on its interpretation of ambiguous provisions in the INA, a statute it is charged with administering, we must grant that interpretation substantial deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Mardones*, 197 F.3d at 624.

suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.").

**2.** Because the IJ granted Sesay's application for withholding of removal, and because the INS has not requested further review of that grant, Sesay may not be removed to Sierra Leone and his life will not be put in jeopardy there. INA § 241(b)(3)(A).

Parole is a legal status that may be conferred by the Attorney General and that allows an alien to be physically present in the country without having been admitted through standard immigration procedures. *See* INA § 212(d)(5)(A) (codified at 8 U.S.C. § 1182(d)(5)(A)) ("The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled....").  The Supreme Court has explained that "[t]he parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).  Because a parolee has not been admitted to the country, he is still considered to be constructively in detention. *See* Aleinikoff, Martin & Motomura, Immigration & Citizenship: Process & Policy 507–08 (4th ed.1998).

Sesay argues that "[b]ecause parole is a form of custody, an alien who has been paroled, like a detained alien, is considered not to have made an entry into the United States.  Hence, granting parole would not

be inconsistent with section 212(f) because no entry would be effected."  Petitioner's Brief at 12 (citations omitted).  Sesay never argued in his administrative proceedings, either to the IJ or the BIA, that he should be granted parole.  He has thus failed to meet the INA's statutory exhaustion requirement, and we do not have subject matter jurisdiction to hear this claim. *See* INA § 242(d)(1) (codified at 8 U.S.C. § 1252(d)(1)) ("A court may review a final order of removal only if ... the alien has exhausted all administrative remedies available to the alien as of right."); *see also Booth v. Churner*, 532 U.S. 731, 734–35, 741 & n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94–95 (2d Cir.1998).  We therefore deny his petition for review.[3]

In addition to the argument that Sesay could have been granted parole by the Attorney General, Sesay's briefs in support of his petition could also be read to argue that asylum does not require "entry" as that term is used in § 212(f) and the Presidential Proclamation, and thus that the BIA erred in deciding that Sesay was ineligible for asylum as a matter of law. *See* Petitioner's Brief at 20–21; Petitioner's Reply Brief at 2–6, 9–10.  Unlike the parole argument, this is a claim that was raised and exhausted in the administrative proceedings below.  In questioning Sesay's counsel about this point at oral argument, however, counsel expressly disclaimed this theory, stating: "I don't deny that a person seeking asylum is seeking to be admitted because they will be admitted

---

**3.**  We also note that even if Sesay had presented the parole argument below, we would reject that argument on its merits.  The INA authorizes the Attorney General to parole an alien who is "applying for admission," and provides that on termination of parole status the alien "shall forthwith return or be re-

turned to the custody from which he was paroled."  INA § 212(d)(5)(A).  An alien who had been *granted* asylum would no longer be in detention pending administrative proceedings because those proceedings would have terminated, and thus the alien could not subsequently be paroled into the United States.

if they're granted asylum. But a person seeking asylum can be paroled by the Attorney General." Transcript of Oral Argument (June 4, 2003), at 15.

Even had counsel not disclaimed this argument, he would still face the burden of showing that we did not owe *Chevron* deference to the BIA's interpretation of the INA. The BIA held that a grant of asylum necessarily requires entry into the country. Petitioner's strongest argument against this reasoning is that an alien whose asylum status has been terminated[4] becomes subject to removal based on any applicable grounds of deportability *or inadmissibility. See* INA § 208(c)(3) ("An alien [whose asylum status has been terminated] is subject to any applicable grounds of inadmissibility or deportability under section[s] 212(a) and 237(a) . . . ."). Because inadmissibility by definition only applies to aliens who have not yet been admitted to the United States—that is, to aliens who have not legally "entered" the country[5]—the fact that an alien becomes subject to inadmissibility upon termination of asylum status could indicate that asylees have never effected an entry into the United States as that term is used in the INA.

*Chevron,* however, requires that "the BIA's interpretations of ambiguous provisions of the INA [be given] substantial deference unless 'arbitrary, capricious, or manifestly contrary to the statute.'" *Mar-*

*dones,* 197 F.3d at 624 (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778). The INS argued at oral argument that the BIA's interpretation of the asylum provision of the INA is reasonable and can be squared with an asylee's legal position upon termination of asylum status. *See* Transcript of Oral Argument (June 4, 2003), at 13. This interpretation involves finding that a grant of asylum necessarily entails an entry, and that if and when asylum status is terminated, the asylee returns "to square one": seeking admission and subject to inadmissibility. *Id.* In light of the record and briefing before us, we could not say with certainty that the BIA's interpretation of the INA is "manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.[6]

For the reasons stated above, Sesay's petition for review of the BIA's order is DENIED.

---

**4.** A grant of asylum is not permanent, and may be terminated if the Attorney General determines, *inter alia,* that the alien is no longer subject to persecution if returned to the country of origin. INA § 208(c)(2).

**5.** INA § 212(a), which establishes the grounds of inadmissibility, states that "aliens who are inadmissible [under the listed grounds] are ineligible to receive visas and ineligible to be admitted to the United States." INA § 101(a)(13)(A) (codified at 8 U.S.C.

§ 1101(a)(13)(A)) defines "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."

**6.** This inclination should not be read to foreclose the future consideration, in a case in which the issue is fully briefed and properly argued, of the question whether a grant of asylum necessarily entails entry within the meaning of § 212(f).