NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0863n.06
Filed: November 27, 2006

No. 05-4044

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ERMAL NEZIRAJ,

      Petitioner-Appellant,

v.

ALBERTO GONZALES,

      Respondent-Appellee.

                                           /

ON APPEAL FROM THE BOARD OF IMMIGRATION APPEALS

BEFORE:    CLAY and SUTTON, Circuit Judges; and SHARP, District Judge.[*]

    **CLAY, Circuit Judge.** Petitioner Ermal Neziraj seeks review of an administrative removal order issued by an Immigration Judge ("IJ") and affirmed on July 28, 2005, by the Board of Immigration Appeals ("BIA"), pursuant to 8 C.F.R. §§ 1003.1(b)(3) and 1240.15, denying his application for 1) asylum under Immigration and Nationality Act ("INA") § 208, 8 U.S.C. § 1158; 2) withholding of removal under INA § 241(b)(3), 8 C.F.R. § 208.16; and 3) protection under the United Nations Convention Against Torture ("Torture Convention"), 8 C.F.R. § 208.16, for failing

---

    [*] The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

to establish past persecution or a well-founded fear of future persecution. For the following reasons, we **AFFIRM** the BIA's decision.

## BACKGROUND

Petitioner, an Albanian citizen, fled Albania on August 21, 2001, and arrived in Los Angeles, California on August 22, 2001, after staying overnight in Milan, Italy. Since Petitioner did not have lawful travel and immigration documents, as required under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I),[1] he was detained and questioned at the airport by immigration officials for three hours. He was provided a translator over the telephone. After questioning Petitioner, immigration officials prepared a statement in English which Petitioner, who speaks and reads little English, signed. According to the airport statement, Petitioner did not have problems with any person, groups, or organizations, and was not threatened with death or bodily harm in Albania. In addition, the airport statement indicated that Petitioner came to the United States to live and work, and to be reunited with his sister in Michigan. Petitioner failed to report any allegations of persecution in Albania.

Immigration officials served Petitioner with a Notice to Appear dated September 26, 2001, charging him with being removable for unlawfully entering the United States. He applied for asylum under INA § 208, 8 U.S.C. § 1158; withholding of removal under INA § 241(b)(3), 8 C.F.R. § 208.16; and for protection under the Torture Convention, 8 C.F.R. § 208.16, contending that he was

---

[1] Petitioner indicated that he traveled with unlawful documents because his applications for a lawful student visa were denied by the United States Consulate in Albania.

persecuted in Albania on the basis of his political opinion and membership in a particular social group, namely, the Democratic Party.

Petitioner had an interview to assess his credible fear of persecution in Albania as part of his immigration applications. At the credible fear interview, Petitioner stated that he had a fear of returning to Albania because he was persecuted by the police and the socialist government. He challenged his airport statement, arguing that he was fatigued at the time of the questioning, and that the interpreter failed to adequately translate the questions. Although the immigration officer concluded that Petitioner had a credible fear of persecution in Albania, he found that Petitioner "offer[ed] no other explanation for the inconsistencies that exist in [his] distinguishable testimonies." (J.A. 130)

On May 3, 2002, the IJ held an initial hearing at which Petitioner admitted the factual allegations contained in the Notice to Appear, thereby conceding removability. On March 12, 2004, the IJ held an evidentiary hearing to make a determination on Petitioner's immigration applications.

At the evidentiary hearing, Petitioner testified that he became involved with the Democratic Party as a member of the Youth Forum in 1994 and officially joined the party on July 5, 1998. As a member of the Democratic Party, Petitioner was actively involved in political activities, participated in party meetings, recruited new members, and organized demonstrations.[2] Petitioner affirmed that the Democratic Party held power in Albania from 1992 to 1996, but that in 1997 the socialist party "came into power by force." (J.A. 62-63) He stated that the Democratic Party did not

---

[2] Although Petitioner asserts that he was involved with the Democratic Party, he was unable to produce documents to corroborate his membership and participation.

3

recognize the 1997 election results, and organized rallies and demonstrations to protest the socialist government. For example, on September 14, 1998, at the funeral ceremony of Azem Hadari, a Democratic Party leader who was assassinated by the socialist government, Petitioner allegedly participated in a demonstration in opposition to the socialist government. Petitioner affirmed that while holding a poster in the demonstration, he was hit in the head from behind. He stated that a police officer threatened him saying "your leader is dead, but you're going to be dead too." (J.A. 66) He testified that he was forcibly dragged to a police vehicle and taken to a police station where he was interrogated and detained for forty-eight hours. The circumstances surrounding the September 14, 1998 incident are unclear because Petitioner's testimony about his injury, abduction and detention was vague and unspecific.

Petitioner also testified that in 1999, he worked as a waiter in Tiranë, Albania in a coffee shop located near the Ministry of Foreign Affairs. He testified that a socialist government official observed him reading a democratic newspaper at the coffee shop, grabbed the newspaper, ripped it, and threatened to have Petitioner terminated from his job if he was seen reading the newspaper again.

Petitioner further testified that in October 2000, he was confronted by police officers in Tiranë, Albania for distributing posters endorsing a Democratic Party mayoral candidate. He affirmed that he was abducted and forced into a police vehicle, taken to a police station where he was insulted, threatened, kicked, beaten with rubber sticks, and punched in the face during a forty-eight hour detention. Petitioner asserts that he sought medical treatment for his injuries in a hospital after he was released. More specifically, he testified that "right after [he] was released from the police

4

station, [he] went to the emergency room." (J.A. 75) However, corroborating evidence he submitted at the hearing indicates that he waited several days to seek medical treatment. Despite the inconsistency, he produced Albanian hospital records which indicated that he had two surgeries: the first in November 2000, and the second in February 2001. At the hearing, Petitioner claimed that he still suffers residual pain in his head and nose.

After the October 2000 incident, Petitioner asserts that he hired an attorney to help protect him from the police. The lawyer helped Petitioner's father obtain a report from the Albanian Department of Justice, Medical-Legal Expertise Services ("medical-legal report"). During the evidentiary hearing, the IJ was interested in exploring whether the medical-legal report was a product of a government investigation into the October 2000 incident:

> JUDGE TO PETITIONER'S COUNSEL
> Q.  Did the government have something to do with the preparation of the report, and are we talking about renegade police officers who were being investigated by the government for perhaps brutality of some sort or police brutality going beyond the . . . scope of their responsibility, is that what we're looking at here?
> . . .
> Q.  In other words, was the government conducting an investigation of his own?
> A.  I believe so, Your Honor, because there was a police report made . . .
> . . .
> Q.  . . . . [I]t looks like the government, themselves, were investigating it . . . . So if I could ask a question . . . just to try to clarify things, how could he claim that it's government action when at the time the government was trying to investigate this alleged incident and which is . . . like an internal affairs report here in the United States . . . where the police . . . have [an] internal affairs department set up to investigate complaints about their own people. So how would this involve the government if the government itself is trying

5

to investigate what he alleges occured to him, and that's what I'm trying to figure out here, how this becomes a medical legal report and if so, is the government really investigating [an] incident involving its own officers and if so, how does that involve the government . . . .

A.     Well, Your Honor, of course, I can explore those questions.

PETITIONER'S COUNSEL TO PETITIONER

Q.     Mr. Neziraj, was this incident investigated by the authorities?

A.     No, I hired an attorney to feel more protected . . .

(J.A. 80-82) Petitioner did not explain the circumstances surrounding the preparation of the report.

At the evidentiary hearing, Petitioner testified that he fled Albania on August 21, 2001, and arrived in Los Angeles, California on August 22, 2001. He stated that when he arrived in the United States, he was detained and questioned at the airport by immigration officials for three hours. He was provided a translator over the telephone. Petitioner claimed that immigration officials prepared a statement in English which Petitioner, who speaks and reads little English, signed. He asserted that the statement was not read back or explained to him before he signed. According to the statement, Petitioner indicated that he did not have any problems with any person, groups, or organizations in Albania, and that he was not threatened with death or bodily harm. Petitioner was examined at the hearing about the airport statement:

PETITIONER'S COUNSEL TO PETITIONER

Q.     And do you recall . . . you were asked if any problems or quarrels with any person, or groups of persons, or any organization in Albania, do you remember being asked that?

A.     Yes, I remember he asked me that question, and the . . . way I understood that question is . . . did you have any quarrels or any fight with any person or any other criminal organization . . . personal problem with somebody criminally [or] involve[ment] in a criminal activity, that's how I understood that.

Q.     And based on your understanding of that question or the meaning of that question, how did you answer?

6

> A. Based on that, I, no.
>
> . . .
>
> Q. . . . do you recall being asked if you know if any person, groups of persons, or organizations in your home country are threatening you with bodily harm or posing to kill you?
>
> A. I, yes, I do remember this question, and the way I understood as it whether I had any problems on personal basis with any criminal group that's been there and I said no.
>
> Q. Now do you fear going back to your country?
>
> A. Yes.
>
> Q. What do you think will happen to you if you return to Albania?
>
> A. I can be incarcerated, I can be killed.

(J.A. 89-92) Petitioner challenged his airport statement arguing that 1) he was tired, fatigued, faint and sick because he had been traveling for more than ten hours with little, if any, food; and 2) because of the translation, he thought that the question was asking about his involvement in criminal activity in Albania. He allegedly indicated that he did not have any problems in Albania based on a misunderstanding. Petitioner asserted that he was never specifically asked about his problems with the police and socialist government in Albania.

At the conclusion of the evidentiary hearing, the IJ denied Petitioner's application for asylum, withholding of removal, and for protection under the Torture Convention, and ordered that he be removed to Albania. The IJ concluded that Petitioner "did not meet his burden of proof in demonstrating that he's endured past persecution, nor has he shown that if forced to return he would face future persecution." (J.A. 10) "[W]hile [Petitioner] may have a subject[ive] fear of persecution based on his alleged expression of his political opinion through his participation in the Democratic Party, [he] did not meet his burden of proof in establishing that he has an objectively reasonable

7

well-founded fear of future persecution." (J.A. 25-26) The IJ found that Petitioner failed to present evidence to independently corroborate his claims.

Petitioner appealed the IJ's decision to the BIA. The BIA decided Petitioner's appeal under 8 C.F.R. § 1003.1(e)(5), which authorizes a single adjudicator to review a case instead of referring it to a three-member panel. On July 28, 2005, the BIA affirmed the IJ's decision, holding that "[a]s we agree with that portion of the [IJ's] decision finding the [Petitioner] failed to meet his burden of proof, we need not review the validity of the other conclusions reached by the [IJ] in the decision." (J.A. 5) The BIA concluded that "[g]iven the [Petitioner's] vague testimony at the hearing, his statements at the time of his arrival, and the overall lack of support for his claim, we agree with the [IJ] that the [Petitioner] has failed to meet his burden of proof." (J.A. 6) The IJ and BIA decisions both found that Petitioner failed to meet his burden of proof to establish past persecution or a well-founded fear of persecution based on race, religion, nationality, membership of a particular social group or political opinion.

## DISCUSSION

### I. Standard of Review

This Court reviews the BIA's decision under a substantial evidence standard of review. The BIA's decision "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quotations omitted) (citing 8 U.S.C. § 1105a(a)(4)). The IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir., 2005); *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir.

2003); *INS v. Ventura*, 537 U.S. 12, 16-18 (2002). Statutory claims concerning questions of law involving the INA are subject to *de novo* review, but the Court should give some deference to the BIA's statutory interpretation. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). In the instant case, the Court "look[s] to the combination of the [IJ's] opinion and the [BIA's] single-member decision to understand the conclusions reached in the adjudication." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,886 (Aug. 26, 2002); *Yu v. Ashcroft*, 364 F.3d 700, 702-03 (6th Cir. 2004).

## II.     Asylum Application

### A.     The Legal Framework

To be eligible for asylum, an alien must present evidence of actual past persecution, or have a well-founded fear of future persecution on account of race, religion, nationality, membership of a particular social group or political opinion. INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 438 (1987). An alien who satisfies the burden of showing past persecution is presumed to have a well-founded fear of future persecution. 8 C.F.R. §§ 208.13(a) and 208.13(b)(1)(i); *Ouda*, 324 F.3d at 455. The fear of persecution must be both subjectively genuine and objectively reasonable. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). The fear of persecution may be established either through the production of specific documentary evidence or by credible and persuasive testimony. *Id.* Past persecution does not require corroborative evidence, *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998), because an applicant's "testimony . . . if credible, may be sufficient

to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a); *Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005).

The IJ's credibility determinations are considered findings of fact, and are reviewable under the substantial evidence standard and "are treated as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Hassan*, 403 F.3d at 434 (quotation and citation omitted); *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004). Although the IJ's credibility finding is afforded substantial deference, the finding should be supported by specific reasons. *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004). "An adverse credibility finding must be based on issues that go to the heart of the applicant's claim," *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004), and cannot be based on irrelevant inconsistencies. *Daneshvar*, 355 F.3d at 623 n.7. The IJ's determination with respect to the availability of corroborating evidence cannot be reversed unless the Court finds that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable. INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

## B. Petitioner's Credibility

Petitioner contends that he suffered past persecution in Albania on the basis of his political opinion and membership in the Democratic Party. In pertinent part, he argues that he was abducted, interrogated, and detained by police officers for forty-eight hours on two separate occasions – the first, during a demonstration on September 14, 1998, and the second while promoting a mayoral candidate in October 2000. He alleges that he was injured during both incidents, and that the injuries he sustained during his second detention were severe and required extensive medical treatment and surgery. Petitioner argues that his testimony at the evidentiary hearing and corroborating evidence

established his past persecution in Albania and support a reversal of the BIA and IJ decisions. For its part, the government argues that Petitioner failed to meet his burden of showing that he endured past persecution because his hearing testimony 1) was vague, 2) was unsupported with independent evidence, and 3) conflicted with his airport statement.

### 1. The Nature and Quality of the Testimony

The IJ's decision and BIA's affirmance both conclude that Petitioner's hearing testimony was vague. A review of the record indicates that Petitioner was unable to proffer specific or detailed testimony concerning the September 1998 and October 2000 detentions. Although he claimed to have been abducted and detained for forty-eight hours by the police on both occasions, he could not offer any specific details about his abductions, interrogations and detentions. Even his testimony about the alleged police beating in October 2000 is cursory and without meaningful elaboration. Petitioner's testimony simply failed to reveal details of, or insight into, why or how he was abducted in September 1998 and October 2000; his treatment during his forty-eight hour detentions; the conditions of his detentions; and the questions he was asked during his interrogations. Petitioner's testimony was plainly vague and ambiguous. Petitioner failed to articulate meaningful responses to the questions he was asked at the hearing. This Court finds, therefore, that the IJ and BIA properly denied Petitioner's immigration applications because his vague and ambiguous testimony supports a finding that his testimony is not credible.

### 2. Independent Evidence

The IJ and BIA decisions both conclude that Petitioner failed to corroborate his testimony with independent evidence. The record indicates that Petitioner produced some independent

evidence, namely, 1) the medical-legal report; 2) two hospital reports, dated November 21, 2000, and February 9, 2001; 3) a letter from a doctor in the United States affirming that Petitioner had a nose surgery to repair injuries sustained in Albania and was scheduled for another surgery; and 4) a declaration from an Albanian attorney. Petitioner's submissions, however, fail to substantiate his testimony.

Petitioner produced the medical-legal report to corroborate his testimony about being detained and beaten by police officers in October 2000. However, during his examination at the hearing, Petitioner simply could not explain the circumstances surrounding the medical-legal report, namely, he failed to explain exactly how or why the report was prepared, and whether it was related to a government investigation. The medical-legal report, therefore, does not corroborate Petitioner's testimony.

The Albanian medical records and the letter from the United States doctor indicate that Petitioner sustained nose injuries, but do not, and simply cannot, connect his injuries to a detention, beating, or incident of past persecution. Since Petitioner's testimony did not provided specific facts and details about his detention and beating, how he sustained the injuries remains unclear.

Petitioner produced the declaration from the Albanian attorney to substantiate his testimony about the October 2000 police beating. However, the declaration contradicts and undermines Petitioner's testimony. Petitioner affirmed that "right after [he] was released from the police station, [he] went to the emergency room," (J.A. 75), to seek medical treatment for his injuries. Yet, the lawyer's declaration indicates that he waited several days to seek medical treatment. Petitioner failed to reconcile this inconsistency.

Petitioner did not proffer adequate independent evidence to corroborate his alleged past persecution. He also failed to adequately connect his corroborating evidence to his testimony. In addition, although Petitioner avers a long history of involvement with the Democratic Party he failed to produce any evidence of his membership in the party. The Court finds that the IJ and BIA properly denied Petitioner's immigration applications because his testimony lacked meaningful independent evidence.

### 3. Inconsistent Testimony

The IJ and BIA decisions conclude that Petitioner's hearing testimony conflicted with the statement he gave to immigration authorities at the airport on his arrival. Petitioner's airport statement indicated he came to the United States to live and work, and to be reunited with his sister who lives in Michigan. Although Petitioner was not specifically asked if he had any problems with the police or with the socialist government in Albania, he declined to make any additional statements concerning the circumstances of his departure from Albania, and did not apprise the immigration officials of his alleged persecution. Although Petitioner challenges his airport statement, arguing that he was fatigued and misunderstood the questions, he "offers no other explanation for the inconsistencies that exist in these distinguishable testimonies." (J.A. 130)

During his interview at the airport, Petitioner was asked whether he had any problems with any person, groups, or organizations in Albania. Petitioner contends that, based on the interpreter's translation, he understood the question to be about criminal groups and organization. He contends that the IJ and BIA should reconcile his testimony because any inconsistencies constitute "minor and irrelevant inconsistencies [which] cannot constitute the basis for an adverse credibility

determination." *Sylla*, 388 F.3d at 924; *Ahmed v. Gonzalez*, 398 F.3d 722, 727 (6th Cir. 2005). This Court finds that the inconsistencies in the instant case cannot be likened to the minor and irrelevant inconsistencies the Court found in *Sylla*. In *Sylla*, the petitioner proffered inconsistent testimony about the amount of his political party membership fee, and the period during which he was a student. *Sylla*, 388 F.3d at 926. The Court found that "Sylla had little to gain in claiming to have paid fewer Guinean Francs as membership dues," and that "his status as a non-student [did not] have any relationship to the reliability of his persecution claim." *Id.* In the instant case, however, the IJ's adverse credibility finding was "based on issues that go to the heart of the [Petitioner's] claim," *Sylla*, 388 F.3d at 926, namely, whether he endured past persecution in Albania. Unlike the discrepancy in *Sylla*, the inconsistencies in the instant case can be "viewed as attempts by [Petitioner] to enhance his claims of persecution." *Daneshvar*, 355 F.3d at 623 (quotation and citation omitted). The Court finds that the IJ and BIA properly denied Petitioner's immigration applications because his inconsistent statements support a finding that his testimony was not credible.

## III.  Petitioner's Reasonable Fear of Future Persecution

Petitioner contends that he is entitled to a rebuttable presumption that he has a well-founded fear of future persecution because he has established past persecution. 8 C.F.R. § 208.13(b)(1)(i); *Ouda*, 324 F.3d at 445. For its part, the government argues that Petitioner is not entitled to a rebuttable presumption that he has a well-founded fear of future persecution because he failed to establish past persecution. The government's argument is well taken. Since Petitioner "did not sustain his burden of establishing that he suffered past persecution, he [is] not entitled to the

14

presumption under 8 C.F.R. § 208.13(b)(1)(i) of a well-founded fear of suffering future persecution."

*Mikhailevitch*, 146 F.3d at 389; *Ouda*, 324 F.3d at 445.

## IV. Application for Withholding of Removal

Petitioner contends that the IJ and BIA erred in denying his application for withholding of removal, and argues that his application should be granted because he has a well-founded fear of future persecution. To be eligible for withholding of removal, Petitioner must show that it is more likely than not that he will be persecuted on account of race, religion, nationality, membership in a particular social group or political opinion. 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b); *INS v. Stevic*, 467 U.S. 407 (1984). Petitioner argues that he is eligible for withholding of removal because he has suffered past persecution. For its part, the government argues that Petitioner's claim should be denied because the burden of proof for withholding of removal is more stringent than for asylum. The government's argument is well taken. The Court finds that Petitioner's withholding of removal claim is meritless because he has failed to show that he has suffered past persecution. 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b); *INS v. Stevic*, 467 U.S. 407 (1984).

## V. Application for Protection Under the Torture Convention

Petitioner contends that the IJ and BIA erred in denying his application for protection under the Torture Convention, and argues that his application should be granted because he has a well-founded fear of future persecution. Under the Torture Convention, Petitioner has the burden of showing that it is more likely than not that he will be tortured. 8 C.F.R. § 1208.16(c)(2); *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001). In pertinent part, torture is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining

> from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a); *Mostafa v. Ashcroft*, 395 F.3d 622, 625 (6th Cir. 2005). The Torture Convention prohibits the return "of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Matter of G-A-*, 23 I&N Dec. 366, 367 (BIA 2002). Petitioner contends that he was tortured in Albania. More specifically, he argues that the police abducted and beat him on two separate occasions. Although he proffered some medical evidence of having two surgeries to treat nose injuries, it is unclear whether he sustained the injuries during one of the alleged incidents of abduction or detention. Since Petitioner's testimony concerning his abductions, detentions, interrogations, and beatings was vague and unspecific, he has failed to meet his burden of proof that he was tortured in Albania. Petitioner's application for protection under the Torture Convention was properly denied because the burden of proof for protection under the Torture Convention is more stringent than for asylum. *See* 8 C.F.R. § 1208.16(c)(2); *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001).

**VI.     Petitioner's Due Process Claim**

Last, Petitioner contends that the IJ failed to fairly weigh his airport statement against all the evidence in the record, therefore, depriving him of his Fifth Amendment due process rights. To establish a denial of due process, Petitioner must show that he was prejudiced by the IJ and BIA

decisions. *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001); *Hasanaj v. Aschcroft*, 385 F.3d 780, 785 (7th Cir. 2004). The Court finds that Petitioner's due process claim is meritless because the record indicates that the IJ and BIA expressly considered and rejected Petitioner's assertion that he was "very tired at the time [he gave his airport statement] and misunderstood the meaning of the questions." (J.A. at 6) Since the IJ and BIA considered his arguments, Petitioner was afforded due process.

## CONCLUSION

The BIA did not err in denying Petitioner's application for asylum, withholding of removal, and for protection under the Torture Convention, for failing to establish past persecution or a well-founded fear of future persecution. For the foregoing reasons, we **AFFIRM** the BIA's decision.